**Philip M. SMITH, John Plutino, Ronald Cornell and Stephen Marks**

v.

**Richard C. GROOVER, Robert N. Meyer, Jr., Ralph J. Hemminger, Edward A. Arnold, and the Chicago Board of Trade and John Does 1 thru 20, Sam H. LaMantia and William R. Marbel.**

No. 77 C 2297.

United States District Court, N. D. Illinois, E. D.

Feb. 2, 1979.

Supplemental Opinion Feb. 22, 1979.

Liebling, Hauselman, Miller, Chicago, Ill., for plaintiff.

Anton R. Valukas, Eugene R. Wedoff, Jenner & Block, Irwin Askow, Tenney & Bentley, Kirkland & Ellis, Philip F. Johnson, John H. Stassen, Duane M. Kelley, Winston & Strawn, David S. Acker, Winston & Strawn, William J. Martin, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

GRADY, District Judge.

Plaintiffs are buyers and sellers of soybean futures contracts at the Chicago Board of Trade's soybean pit. Defendants are individual soybean traders or brokers and the Chicago Board of Trade ("CBOT" and "the Board"). Plaintiffs allege that they were injured by the manipulative pricing practices of the individual defendants and the failure of the CBOT to enforce its rules.

The CBOT is a contract market, as defined in the Commodity Exchange Act, 7 U.S.C. Section 7 ("CEA"), through which transactions for the future delivery of commodities are consummated. The CEA requires orders for both buyers and sellers to be traded openly and competitively. On the floor of the CBOT, orders are filled and executed through a system known as "open outcry." Prices for futures contracts are quoted in dollars per bushel. A floor trader accepts an offer to purchase or sell a contract at a particular price by shouting his acceptance of the proposed contract terms, or by a hand signal. As the price of the transaction is called out, it is reported to a clerk, who feeds the information into an electronic ticker. The ticker then reports the current price to all those interested in the transaction.

In Count I of their complaint, plaintiffs allege that the individual defendants executed buyers' and sellers' orders without trading in the pits by open outcry, a practice known in the trade as "bucketing." Plaintiffs charge that these defendants thereby manipulated the price of soybean futures contracts in violation of 7 U.S.C. Sections 1–13. In Count II, plaintiffs claim that the individual defendants bucketed orders in furtherance of a conspiracy in restraint of trade, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. Sections 1, 2. In Count III, plaintiffs claim that the CBOT "failed and neglected" to prevent, report, and expose the unlawful activity of the individual defendants, as required by the statute and regulations promulgated by the Commodity Futures Trading Commission ("CFTC" and "the Commission").

Defendants move to dismiss. They argue primarily that the 1974 amendments to the Commodity Exchange Act, which were contained in the Commodity Futures Trading Commission Act ("CFTCA"), and which pro-

vided for reparation proceedings in the CFTC, extinguished the private right of action that courts had previously implied from the statute. Defendants argue, therefore, that plaintiffs' complaint fails to state a claim upon which relief can be granted. Defendants also urge that the CFTC[1] has primary jurisdiction to adjudicate claims of rule violations by either floor traders or contract markets, and that this court is therefore without jurisdiction to entertain plaintiffs' suit at this time.

For the reasons stated below, the motions to dismiss Counts I and III of the complaint are denied. The motions to dismiss Count II are granted. For purposes of these motions, the factual averments of the complaint are assumed true.

## I. INTRODUCTION: BACKGROUND OF THE 1974 AMENDMENTS TO THE CEA

The original Commodity Exchange Act was enacted in 1936, and significantly amended the Grain Futures Act of 1922. The amended Act established a scheme for regulating trading in agricultural commodities futures based chiefly on the concept of self-regulation. The Act required that all transactions in commodity futures be executed by a member of a designated "contract market." 7 U.S.C. Section 6h. A contract market could be designated as such by the Secretary of Agriculture only after satisfying the Secretary that it had taken certain prescribed steps to insure that its members would not engage in various manipulative practices. 7 U.S.C. Section 7. A contract market could establish rules of conduct for its members, who were subject also to certain prohibitions in the Act itself, including provisions against bucketing orders and engaging in other manipulative conduct. 7 U.S.C. Sections 6b, 7a(1).

The CEA did not explicitly provide a remedy for defrauded commodity futures investors. In 1967, however, a private right of action was implied against a registered commission merchant for violations of the CEA. *Goodman v. H. Hentz & Co.,* 265 F.Supp. 440, 447 (N.D.Ill.1967). In *Deaktor v. L. D. Schreiber & Co.,* 479 F.2d 529, 534 (7th Cir. 1973), *rev'd on other grounds sub nom., Chicago Mercantile Exchange v. Deaktor,* 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973), the Seventh Circuit extended the holding in *Goodman* by recognizing a private right of action against a commodities exchange for negligent failure to enforce its rules against fraudulent and manipulative practices by floor traders. In subsequent decisions, the Seventh Circuit has consistently upheld the right of a defrauded commodity futures investor to maintain a private damage action under the CEA against floor traders and the exchange on which they traded. *Hirk v. Agri-Research Council, Inc.,* 561 F.2d 96, 103 (7th Cir. 1977) (commission merchants); *Case & Co. v. Board of Trade,* 523 F.2d 355, 360 (7th Cir. 1975) (exchange).

Closely related to the question of an implied private right of action in the decisions just discussed was the question of the primary jurisdiction of the Commodity Exchange Commission, the predecessor of the CFTC. The seminal case on the issue of primary jurisdiction was *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). In *Ricci,* plaintiffs sued the Chicago Mercantile Exchange, its officers and directors, and an exchange member for transferring plaintiff's seat on the exchange without notice and a hearing. According to the complaint, this exclusion of plaintiff from trading violated the CEA and the Exchange's rules, and constituted an unreasonable restraint of trade under the Sherman Act. The Seventh Circuit held that the District Court should have stayed proceedings until the Secretary of Agriculture or the Commodity Exchange Commission had determined in an administrative proceeding whether the CEA or the Exchange's rules had been violated. The Supreme Court affirmed. The Court found that the case satisfied three conditions which made a stay of the district court proceedings prudent. First, had the

---

1. The CFTC has filed an amicus curiae brief.

case gone forward in the district court, that court would necessarily have had to determine whether the CEA and the Exchange's membership rules created an immunity from the antitrust laws. Second, part of the controversy was within the statutory jurisdiction of the Commission. Finally, a decision by the Commission promised to be of material aid in resolving the immunity question. *Id.* at 302, 93 S.Ct. 573.

In *Deaktor v. L. D. Schreiber & Co.,* 479 F.2d 529 (7th Cir. 1973), the Seventh Circuit had its first opportunity to apply the rationale of *Ricci.* Plaintiffs sued individual members of the Chicago Mercantile Exchange for cornering the market in, and manipulating the price of, pork bellies. Plaintiffs also charged that the Chicago Mercantile Exchange had negligently failed to enforce its rules against the manipulations. As in *Ricci,* plaintiffs joined to their counts under the CEA an allegation that defendants' conduct violated both the CEA and the Sherman Act. Defendants argued that the doctrine of primary jurisdiction applied, but the Seventh Circuit held that the three conditions established by the Supreme Court in *Ricci* were not present. The court acknowledged that the related claims of cornering and price manipulation clearly fell within the jurisdiction of the Commission. The second *Ricci* condition, therefore, had been satisfied. But in *Deaktor,* unlike *Ricci,* the allegedly anticompetitive conduct, price manipulation, could not even arguably be immunized by the CEA or the Exchange's rules. Thus, the first and third *Ricci* conditions were not satisfied. Furthermore, the Seventh Circuit found that the *Deaktor* case did not pose any questions which required for their resolution administrative fact-finding expertise. Judges and juries are considered competent to unravel the complexities of price manipulation in both antitrust and securities cases, the court noted, and "[t]here is no reason to believe that they would have more difficulty with factual issues involving the purchase and sale of commodities." *Id.* at 533. Thus, the policy rationale for deferring to the Commission was lacking.

Defendants appealed and in a short *per curiam* opinion, the Supreme Court reversed. Reasoning that Congress had established a specialized agency to determine whether an Exchange rule had been violated, and that the Commission's determination would greatly assist the district court in arriving at an accommodation between the antitrust and regulatory schemes, the Court held that plaintiffs "should be routed in the first instance to the agency whose administrative functions appear to encompass adjudication of the kind of substantive claims made against the Exchange in this case." *Chicago Mercantile Exchange v. Deaktor,* 414 U.S. 113, 115, 94 S.Ct. 466, 467, 38 L.Ed.2d 344 (1973). By its holding, the Court apparently intended that, regardless of the judicial factfinder's competence to decide a particular cause of action, the district court was obliged to refer to the Commission any cases involving alleged violations of both the commodities and antitrust laws. The Court's decision in *Deaktor,* rendered on December 3, 1973, represented the most current judicial development of the doctrine of primary jurisdiction during the time Congress was considering a major overhaul of the CEA.

Reacting to a variety of recent economic developments, Congress in 1974 enacted the Commodity Futures Trading Commission Act ("CFTCA"), which significantly amended the CEA. By 1974, commodities trading, which had undergone a tremendous expansion during the late 1960's and early 70's was playing a more significant role in the marketing system of the United States. In 1973, over $500 billion in futures were traded. Remarks of Senator Talmadge, 120 Cong.Rec. 30458 (1974). During this era of rapid growth, instances of fraud and manipulation had increased significantly. Under the CEA, dishonest practices were supposed to be controlled both by the Commission's regulations and by the Exchange's own rules. By 1974, however, self-regulation had become noticeably ineffectual.

Congress traced the inadequacies of the self-regulatory regime to a number of factors. First, the enforcement staffs of commodities exchanges were unable to handle

the vastly increased trading volume. H.R. Rep. No. 975, 93d Cong., 2d Sess. 46 (1974). Also, exchanges faced "growing difficulties . . . as a result of private plaintiffs seeking damages against self-regulatory activities of the markets." *Id.* at 48. Because an implied right of action could be brought against an exchange for failure to enforce its own rules, "attorneys to several boards of trade had been advising the boards to *reduce*—not expand exchange regulations designed to insure fair dealing." *Id.* at 46. Finally, an exchange simply lacked the necessary motivation and vigilance to effectively police its own members.

Despite its shortcomings, however, self-regulation remained a "commendable and noble concept and useful in such a complex atmosphere as that which surrounds futures trading." H.R.Rep. No. 975, 93d Cong., 2d Sess. 48 (1974). What was needed was a "strong Federal regulatory umbrella," to insure the efficacy of the regulatory efforts undertaken by exchanges. *Id.* The mainstay of this umbrella, Congress decided, would be the CFTC. Armed with strong regulatory powers, the CFTC was designed to guarantee "fair practices and honesty on the exchanges" and curb "speculative activities that periodically demoralize markets." Remarks of Senator Talmadge, 120 Cong. Rec. 30458 (1974).

As envisaged by the Congress, the CFTC would strike at unfair trading practices both at the institutional, or exchange level, and at the individual level. If an exchange fails to enforce its approved rules, the Commission's regulations, or the statute's prohibitions the CFTC may initiate an administrative hearing in which a civil penalty of up to $100,000.00 could be assessed against it. 7 U.S.C. Section 13a. The Commission may also alter or supplement the exchange's own rules after providing notice to the exchange. 7 U.S.C. Section 12a(7). The CFTCA also empowers the Commission to file an action in federal district court to enjoin an exchange from engaging in any conduct violative of either the statute or the regulations of the CFTC. 7 U.S.C. Section 13a–1. Other provisions in the Act grant the Commission an even more potent enforcement power. After notice and an administrative hearing, and subject to review in the Circuit Court of Appeals, the CFTC may suspend or revoke an exchange's designation as a contract market for failure to enforce the statute, the Commission's regulations, or the contract market's own rules. 7 U.S.C. Sections 7b, 8.

Similarly, Congress vested in the Commission broad enforcement powers to combat trading abuses by individual traders. The 1974 amendments authorize the Commission to initiate an administrative hearing against any individual who has violated the statute or exchange regulations, to assess a civil penalty of up to $100,000.00, and to revoke or suspend the individual's trading privileges. 7 U.S.C. Section 9. The Commission may also issue cease and desist orders. 7 U.S.C. Section 13b. Finally, the amended statute provides that the United States Attorney may seek an indictment against an individual who has violated certain sections of the Act, including the section which prohibits bucketing of customer orders. 7 U.S.C. Section 13(c).

In addition to these public enforcement measures at both the exchange and individual trader levels, Congress also provided for reparations proceedings, in which an injured party may sue to recover for injuries caused by violations of the Act, CFTC regulations, or exchange rules. 7 U.S.C. Section 18(e). The House Committee carefully delineated the range of potential respondents in these reparations proceedings: "It is primarily intended as a forum for aggrieved customers of persons registered under the Act under Sections 4d, 4e, 4k or 4m. Contract markets are not intended to be included since they are not persons registered under the Act." H.R.Rep. No. 975, 93d Cong., 2d Sess. 22 (1974). Thus, reparations proceedings may be initiated against futures commission merchants, floor brokers, commodity trading advisors, and commodity pool operators, but not against exchanges. 7 U.S.C. Section 18(a), (e). After obtaining a reparation award against an individual, the aggrieved party may enforce the award in an appropriate federal district court. 7 U.S.C. Section 18(f).

Congress also attempted to accommodate the 1974 CEA amendments with the anti-trust laws. The Department of Justice objected to language in the original House bill which merely required the CFTC to consider the public interest to be protected by the antitrust laws as well as the policies and purposes of the Act. 120 Cong.Rec. 30460. The House Committee on Agriculture and Forestry also "did not want to exempt the futures industry from the antitrust laws and it did not wish to encourage the Commodity Futures Trading Commission to restrict competition and ignore the public policies protected by the antitrust laws." *Id.* The Justice Department's concern found eventual expression in the amended House bill and the Act as finally passed:

The Commission shall take into consideration the public interest to be protected by the antitrust laws and endeavor to take the least anticompetitive means of achieving the objectives of this chapter, as well as the policies and purposes of this chapter, in issuing any order or adopting any Commission rule or regulation, or in requiring or approving any bylaw, rule, or regulation of a contract market.

7 U.S.C. Section 19. If a person or group of persons involved in the commodities trade are acting outside the scope of a rule or regulation adopted under the CFTCA, or if they are violating such a rule, the Act does not purport "to exempt them from existing laws or regulations such as the antitrust laws." Remarks of Senator Talmadge, 120 Cong.Rec. 30459, 30461 (1974); *see also,* Remarks of Congressman Mayne, 120 Cong. Rec. 34754 (1974); S.Rep. No. 1131, 93d Cong., 2d Sess., *reprinted in* U. S. Code Cong. & Ad. News 5863 (1974).

Congress realized that the 1974 amendments represented a thorough revision of the manner in which the commodities futures trading industry would be regulated, and that, absent an explicit statutory direction, the amendments could confuse existing law. As a result, the sponsors sought to delimit the intended effect of the amendments upon existing judicial and administrative law. According to the sponsors, the CFTC would have exclusive jurisdiction over commodities futures trading, and the SEC would retain its jurisdiction over trading in securities and securities options. 120 Cong.Rec. 30459, 30461 (1974); Remarks of Rep. Poage, 120 Cong.Rec. 34737 (1974). If, in certain situations, the jurisdiction of the CFTC and the SEC overlapped, the two agencies were expected to consult with one another and work out a common policy. Congress was willing to tolerate the possible inefficiencies inherent in overlapping jurisdiction in order to achieve its fundamental purpose—the prevention of regulatory gaps in stock and commodity trading. Remarks of Senator Talmadge, 120 Cong. Rec. 34997 (1974).

Congress also considered what effects the creation of the CFTC should have upon the jurisdiction of the courts. The basic Congressional policy was that "jurisdiction conferred on Federal and State courts . . . under the laws of the United States or any State are retained." Remarks of Senator Humphrey, 120 Cong.Rec. 35000 (1974); *see also,* Statement of Senator Talmadge, 120 Cong.Rec. 34997 (1974). With regard to the variety of administrative proceedings which may be brought by the CFTC, Congress intended that:

The vesting in the Commission of the authority to have administrative law judges and apply a broad spectrum of civil and criminal penalties is likewise *not intended to interfere with the courts in any way.* It is hoped that giving the Commission this authority will somewhat lighten the burden upon the courts, but the entire appeal process and the right of final determination by the courts are expressly preserved. (emphasis added).

Remarks of Senator Talmadge, 120 Cong. Rec. 30459 (1974). This intention found expression in the definitional section of the Act, which provides:

That the Commission shall have exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as an "option" . . . . .) *Nothing in this section shall supersede or limit the jurisdiction con-*

*ferred on courts of the United States or any State.* (emphasis added).

7 U.S.C. Section 2.

With this brief review of the history of the CFTCA in mind, we turn to the merits of defendants' motions.

## II. COUNT I: IMPLIED RIGHT OF ACTION AGAINST INDIVIDUAL DEFENDANTS

Since the passage of the CFTCA, three courts have indicated either expressly or by implication that the amendments to the CEA abolished the implied private right of action against a member of a commodities exchange. *See Consolo v. Hornblower & Weeks-Hempill, Noyes, Inc.,* 436 F.Supp. 447, 454–455 (D.Ohio 1976) (no private right to stay arbitration proceeding and compel litigation in district court); *Bartels v. International Commodities Corp.,* 435 F.Supp. 865, 870 (D.Conn.1977) (no private right to sue on commodity options contract; reparation the primary remedy); *Arkoosh v. Dean Witter & Co., Inc.,* 415 F.Supp. 535, 540 (D.Neb.1976) (statutory claims to be tried before agency and common law claims before courts). On the other hand, at least four courts have stated that a private right of action is still available. *Hofmayer v. Dean Witter & Co.,* 459 F.Supp. 733 (N.D. Cal.1978); *Gravois v. Fairchild Arabatzis & Smith, Inc.,* No. 78–1406 (E.D.La.1978); *Berenson v. Madda Trading Company,* No. 78–544 (D.D.C.1978); *Bache Halsey Stuart, Inc. v. French,* 425 F.Supp. 1231, 1234 n.4 (D.D.C.1977) (*dictum*); *Shearson Hayden Stone v. Lumber Merchants, Inc.,* 423 F.Supp. 559, 561 (S.D.Fla.1976) (doctrine of primary jurisdiction does not mandate that action for damages for alleged violations of the Act be stayed pending reparations proceedings in the CFTC). Such a sharp schism in the relevant case law compels us to examine in some detail the intricacies of this issue.

At the outset, we note that the parties disagree as to the proper analytical approach we should take to the question of whether the prior, well-established cause of action against defendants for violations of

the CEA and exchange rules survived the 1974 amendments to the CEA. Defendants urge us to apply the standards announced by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). There, a stockholder brought a private action to compel directors to reimburse the corporation for corporate political expenditures allegedly made in violation of 18 U.S.C. Section 610. The Court of Appeals had implied a private remedy from the statute. The Supreme Court reversed. In its opinion, the Court enumerated four elements which must be considered in deciding whether a private remedy should be implied from a particular statute:

> First, is the plaintiff "one of the class for whose especial benefit the statute was enacted"—(cite omitted)—that is, does the statute create a federal right in favor of the plaintiff?
>
> Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? (cites omitted).
>
> Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? (cites omitted).
>
> And, finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? (cites omitted).

422 U.S. at 78, 95 S.Ct. at 2088.

Plaintiffs argue that the *Cort v. Ash* standards apply only when a federal court is determining whether a previously unrecognized cause of action will be implied from a given statutory scheme. They, and the CFTC as *amicus curiae,* claim that an implied right of action under the CEA must be presumed to have survived amendments to the statute unless Congress explicitly abolished the private remedy in enacting the amendments. We agree with plaintiffs that a recognized cause of action should not be subjected to the *Cort v. Ash* scrutiny every time such an action is litigated. But where the statutory framework in which

the private remedy had its provenance is significantly altered, the continued vitality of the private remedy should be re-examined. Such a reappraisal is particularly appropriate here, where Congress provided aggrieved commodities traders additional remedies in the 1974 amendments. Accordingly, we proceed with the *Cort v. Ash* test.

## A. *The Protected Class*

■ Defendants argue that if plaintiffs are speculators, a term which defendants leave undefined, they are not within the class for whose especial benefit the statute was enacted. Defendants direct us to two sections of the Act, 7 U.S.C. Sections 5 and 6a, which, defendants claim, indicate that the class for whose "especial" benefit it was enacted are only the producers and consumers of commodities.[2] Those sections, however, merely reveal a congressional concern for excessive speculation, and the adverse effect it can have on commodity prices; nothing in them indicates that Congress intended to exclude "speculators" from the Act's protection. In fact, in reporting on the 1974 amendments to the CEA, the House Agriculture Committee recognized the important role speculators play in the commodity futures trading market and the need to regulate the market to protect these investors. H.R.Rep. No. 975, 93d Cong., 2d Sess. 35 (1974).

Thus, we conclude that the 1974 amendments to the CEA were designed to protect all investors in commodities, including both hedgers and speculators, from manipulative practices such as those alleged to have been engaged in by defendants.

## B. *Legislative Intent*

■ The parties offer us diametrically contradictory interpretations of the legislative history of the 1974 amendments to the CEA. On one point, however, there can be no disagreement. The legislative history shows conclusively that in 1974 Congress was aware that a number of federal courts had implied a private right of action under the CEA. *See, e. g.,* Remarks of Rep. Poage, 119 Cong.Rec. 41333 (1973); Hearings on H.R. 11955 Before the House Committee on Agriculture, 93d Cong., 2d Sess. 249, 321; Hearings on S. 2485, S. 2578, S. 2837 and H.R. 13113 Before the Senate Committee on Agriculture and Forestry, 93d Cong., 2d Sess. pt. 3, at 737, 746 (1974). Our review of legislative history must be made with this in mind.

Defendants argue that the defeat of three bills which were introduced in 1973 and which contained provisions for private damage remedies for aggrieved investors[3] reflected a congressional unwillingness to subject floor traders and others to private damage actions. We disagree. The bills to which defendants refer all provided for the recovery of treble damages, a remedy previously unavailable to plaintiffs suing on an implied right of action. The defeat of these bills, therefore, demonstrates nothing more than a congressional decision not to expand recovery under the existing private right.

Defendants also claim that the exclusive jurisdiction provision of the CFTCA, amended Section 2, indicates an intention to abolish the implied right of action. Section

**2.** Those sections provide, in relevant part:

[T]he transactions and prices of commodity (sic) on such boards of trade are susceptible to speculation, manipulation, and control, and sudden or unreasonable fluctuations in the prices thereof frequently occur as a result of such speculation, manipulation, or control, which are detrimental to the producer or the consumer and the persons handling commodity (sic) and products and byproducts thereof in interstate commerce, and such fluctuations in prices are an obstruction to and a burden upon interstate commerce in commodity (sic) and the products and byproducts thereof and render regulation imperative for the protection of

such commerce and national public interest therein. 7 U.S.C. Section 5.

(1) Excessive speculation in any commodity under contracts of sale of such commodity for future delivery made on or subject to the rules of *contract markets causing sudden or unreasonable fluctuations or unwarranted changes* in the price of such commodity, is an undue and unnecessary burden on interstate commerce in such commodity. 7 U.S.C. Section 6a.

**3.** H.R. 11195, 93d Cong., 1st Sess. Section 17(3) (1973); S. 2837, 93d Cong., 1st Sess. Section 505 (1973); S. 2578, 93d Cong., 1st Sess. Section 20(3) (1973).

2(a)(1) of Chapter 7 vests the Commission with "exclusive jurisdiction" with respect to

[a]ccounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option' . . .), and transactions involving contracts of sale of a commodity for future delivery . . . ..

Since its enactment, courts have interpreted that section as ousting all other federal agencies of authority to act with respect to matters within the Commission's exclusive jurisdiction and preempting state regulation of these matters. *See, e. g., Securities and Exchange Commission v. American Commodity Exchange, Inc.,* 546 F.2d 1361, 1367 (10th Cir. 1976); *Securities and Exchange Commission v. Univest, Inc.,* 405 F.Supp. 1057, 1059 (N.D.Ill.1976), *remanded,* 556 F.2d 584 (7th Cir. 1977). We agree with the *amicus curiae,* however, that the legislative history of Section 2(a)(1) refutes defendants' argument that the exclusive jurisdiction provision affected the existence of a private right of action.

As noted above, when Congress enacted the exclusive jurisdiction provision, it recognized that "courts [had] implied a private remedy for individual litigants in the Commodity Exchange Act." Remarks of Rep. Poage, 119 Cong.Rec. 41333 (1973). The Senate Committee on Agriculture and Forestry, however, heard testimony warning that the cumulative effect of the reparation provision and the exclusive jurisdiction provision might have been to inadvertently repeal the previously recognized jurisdiction of the courts to entertain private damage actions. Hearings on S. 2485, S. 2578, S. 2938 and H.R. 13113 Before the Senate Committee on Agriculture and Forestry, 93d Cong., 2d Sess. pt. 1 at 205 (testimony of Senator Dick Clark), pt. 3 at 737 (testimony of Ray A. Schotland, Professor of Law, Georgetown University Law Center) (1974). The Senate Committee therefore inserted into the exclusive jurisdiction section, 2(a)(1), the following proviso: "Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State."

Highlighting the word "section," defendants argue that since the reparations proceeding is found in another section of the act, Section 18, congressional disapproval of the implied right of action could still be found, consistent with the language of the Act. We are not persuaded. The Conference Committee adopted the language of the Senate amendment, but explained in its report that the purpose of the amendment was "to make clear that nothing *in the Act* would supersede or limit the jurisdiction presently conferred on courts of the United States or any State." 120 Cong.Rec. 34997 (October 10, 1974); 120 Cong.Rec. 34737 (October 9, 1974). (emphasis added).

The legislative history of more recent amendments to the CEA supports our position that the 1974 amendments were not intended to deprive plaintiffs of the private right of action courts had implied from the Act. During the floor debates on an amendment which would increase the number of reparation claims that might be disposed of by the Commission without resort to a full adjudicatory hearing, Senator Walter D. Huddleston, sponsor of the bill, noted:

Thus, an aggrieved commodity customer will be able to obtain more expeditious treatment of his claim should the customer elect to pursue a claim in reparations rather than proceed to arbitration or pursue in court the private right of action which has been judicially implied for violations of certain provisions of the Commodity Exchange Act, or which in the future courts may recognize for other provisions of the Act.

124 Cong.Rec. S. 10537 (July 12, 1978). Senator Huddleston also criticized a federal district court's opinion, on which defendants rely, which took the "unfortunate position that Congress intended reparations to be the exclusive forum for adjudicating commodity customer claims." *Id.*

In light of the foregoing excerpts from the relevant legislative history, we think that Congress intended the reparations proceeding provided for in the CFTCA as a supplement to, rather than a substitute for, the existing private right of action.

## C. *Consistency with the Statutory Scheme*

We believe that the continued existence of a private right of action for aggrieved investors is perfectly compatible with the language and purpose of the CFTCA. Affording injured commodities futures buyers a multiplicity of remedies against futures traders will deter the sort of manipulative pricing practices alleged to have been committed by defendants. As shown above, Congress intended the reparations proceedings in the CFTC to constitute an alternative to the more time-consuming, cumbersome, expensive and formal adjudication of private claims in federal or state courts. The availability of a variety of remedies thus harmonizes well with the Congressional intent to protect the public from fraud and price manipulation.

Recent administrative interpretations of the CFTCA also demonstrate the compatibility of a private right of action with the purposes of the Act. The CFTC has consistently interpreted the reparations section as permitting commodity customers an election of forums in which to pursue their claims. *See* 41 Fed.Reg. 3994 (1976); 41 Fed.Reg. 18472 at n.5 (1976); *Stucki v. American Options Corp.*, CCH Comm.Fut.L. Rep. ¶ 20,559 at 22,283 (CFTC 1978). The CFTC will not even entertain a reparation claim if civil court litigation involving the same facts and parties has been instituted. 17 C.F.R. § 12.21(a)(7) (1977). We recognize that ". . . the consistent construction of a statute 'by the agency charged with its enforcement is entitled to great deference by the courts.'" *United States v. Consumer Life Insurance Co.*, 430 U.S. 725, 752, 97 S.Ct. 1440, 1454, 52 L.Ed.2d 4 (1977), quoting from *NLRB v. Boeing Co.*, 412 U.S. 67, 75, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973); *see also, Chemehuevi Tribe of Indians v. Federal Power Commission*, 420 U.S. 395, 409–10, 95 S.Ct. 1066, 43 L.Ed.2d 279 (1975). Accordingly, we find that this third *Cort v. Ash* factor also weighs in favor of implying a private right of action.

## D. *State Cause of Action*

As defendants point out, plaintiffs may have an action against defendants sounding in tort or breach of fiduciary duty, which plaintiffs could prosecute in state court. *See Barker v. Commodity Management Systems, Inc.*, CCH Comm.Fut.L.Rep. ¶ 20,432 (CFTC 1977). But it cannot be said that a cause of action against floor traders for "bucketing" their customers' orders is one "traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law." *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975). The practices of traders on the floor of a commodity market are primarily of federal concern. Federal, not state regulation, is the hallmark of trading in commodities futures, and has been since the predecessor of the Commodity Exchange Act was first enacted in 1922. Furthermore, the legislative history of the 1974 amendments to the CEA reveals a congressional desire not to relegate aggrieved investors to state remedies, but to provide a "federal regulatory umbrella" over trading in commodities futures, complete with federal remedies. Thus, notwithstanding the possible availability of a common law remedy to redress plaintiffs' injuries, this fourth factor still tips in favor of implying a federal cause of action.

For the reasons outlined above, we deny defendants' motion to dismiss Count I of the complaint. An implied private right of action against the individual defendants survived the 1974 legislative overhauling of the CEA.

## III. COUNT II: CLAIMS UNDER THE SHERMAN ACT

The individual defendants move to dismiss Count II of the complaint on the ground that the remedies under the Sherman Act are inconsistent with those under the CEA. Defendants rely on *Schaefer v. First National Bank of Lincolnwood*, 326 F.Supp. 1186, 1190–92 (N.D.Ill.1970), *aff'd*, 509 F.2d 1287, 1300 (7th Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1682, 48

L.Ed.2d 186 (1976). In *Schaefer,* plaintiffs sued defendants for manipulating the price of stock which plaintiffs had purchased. Plaintiffs' complaint alleged common law fraud, violations of Section 1 of the Sherman Act, Sections 1, 4, 5, 12 and 16 of the Clayton Act, and various provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934. The district court, per Judge Decker, dismissed the antitrust claims. The court reasoned that where the law provides a special statutory remedy for specific conduct, as well as a general provision which is comprehensive enough to include that specific conduct and a wide variety of other conduct, the general remedy is inapplicable. Thus, plaintiff could rely only on the specific remedy implied from the securities law. 326 F.Supp. 1190. Judge Decker added that

> a number of inconsistencies would result if plaintiffs were permitted to pursue both a Sherman Act and Securities Act cause of action. Beyond the differences in recoverable damages just referred to, there are significant differences in the governing statutes of limitation . . . and in the provisions for attorney's fees . . . .

*Id.* at 1192. In affirming Judge Decker's decision, the Court of Appeals for the Seventh Circuit approved his rationale for dismissing the antitrust claims. 509 F.2d 1287, 1299–1300 (1975).

*Schaefer* was recently followed in the case of *In re Transocean Tender Offer Securities Litigation,* 427 F.Supp. 1208 (N.D. Ill.1977). There, plaintiffs filed a class action complaint alleging that defendants violated both the securities and antitrust laws in making a tender offer for the shares of one of the corporate defendants. The court dismissed the antitrust portions of plaintiffs' complaint because plaintiffs had not alleged that defendants' method of acquiring the stock had lessened competition in some line of commerce. 427 F.Supp. at 1210. The court added, however:

> [T]o the extent that plaintiffs seek relief because of alleged actions such as market manipulation or coercion, their claims must be pursued under the securities law.

See *Schaefer v. First National Bank of Lincolnwood,* 509 F.2d 1287, 1299–1300 (7th Cir. 1975), cert. denied, 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976). When, as here, the securities laws protect plaintiffs against the acts complained of and when, as here, plaintiffs have elected to pursue said claims under these laws, the antitrust claims are superfluous at best.

*Id.* at 1300.

We find the *Schaefer* reasoning applicable to this case. Plaintiffs alleged that defendants bucketed orders for soybean futures, in violation of the CEA, and the rules of the CBOT and CFTC regulations. Since plaintiffs have a private right of action under the CEA, their antitrust claims, like those of plaintiffs in *Schaefer,* are "superfluous." The specific statutory prohibitions contained in the CEA, as amended, must prevail over the general prohibitions of the Sherman Act. See *also, Bucher v. Shumway,* 452 F.Supp. 1288, 1291–92 (S.D.N.Y. 1978).

Furthermore, the remedies plaintiffs are here pursuing are somewhat inconsistent, as they were in *Schaefer.* Under the CEA, plaintiffs may recover only single damages; the Sherman Act provides for recovery of treble damages. Also, the statute of limitations for plaintiffs' CEA claims are shorter than that provided by the Sherman Act. (See Part IVC, *infra*). Given these apparent inconsistencies, plaintiffs must pursue their more specialized remedy.

Plaintiffs mischaracterize the issue as whether the 1974 amendments to the CEA impliedly repealed the antitrust laws. We agree with plaintiffs that the drafters of the CFTCA intended to leave the antitrust laws intact. One provision in the Act, for instance, directs the CFTC to "take the least anticompetitive means of achieving the objectives of this chapter" in formulating regulations and orders. 7 U.S.C. Section 19. But the question we face is merely whether plaintiffs may pursue different remedies, one which is aimed at the precise conduct alleged to have been committed by

defendants, and the other which is aimed at a universe of conduct, of which defendants' alleged acts constitute just a small set. The *Schaefer* decision compels us to answer this question in the negative.

The *Silver* case, on which plaintiffs rely, is inapplicable here. In *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), the Supreme Court held that exchanges are not absolutely immune from liability under the antitrust laws. There, plaintiffs brought suit against the exchange under the Sherman Act and the common law of tort. Defendant claimed that its acts were in furtherance of its statutory duty of self-regulation, and that it was therefore immune from the antitrust laws. The Supreme Court held that the Securities Exchange Act did not impliedly repeal the antitrust laws with regard to the exchange. The *Silver* case is inapposite because there plaintiffs were not simultaneously pursuing an antitrust action and an action under the securities laws. Had the *Silver* plaintiffs had a cause of action against the Exchange under, say the Securities Exchange Act, then the *Schaefer* rationale might have come into play. Since they did not, the only question before the Court was whether defendant's conduct was immunized by the securities laws. Here, that question is absent from the case.

The motion to dismiss Count II will be granted.

## IV. COUNT III: IMPLIED RIGHT OF ACTION AGAINST THE BOARD

The Chicago Board of Trade moves to dismiss Count III, the only Count asserted against it, on a number of grounds. We will discuss each ground separately.

### A. *Implied Private Right Against the Board*

■ The CBOT, like the individual defendants, claims that the implied private right of action which was previously recognized did not survive the 1974 amendments to the CEA. The CBOT's argument is somewhat different from that of the individual defendants, however. Basically, the Board contends that by consciously excluding contract markets from liability under both the reparations provision of the CFTCA, 7 U.S.C. Section 18, and more recently from the section of the amended Act which allows *parens patriae* actions by state attorneys general, Act of Sept. 30, 1978, 92 Stat. 872 (7 U.S.C. Section 13a–2), Congress demonstrated an intent to insulate them from private damage actions altogether. In terms of the *Cort v. Ash* elements, the preferential treatment of contract markets under the 1974 and 1978 amendments to the CEA, the Board argues, tips the balance against continuing to imply a private right of action against it.

We disagree. The relevant legislative history, as already pointed out, shows conclusively that Congress was aware in 1974 and 1978 that courts had recognized private rights of action against contract markets and individual floor traders. To be sure, Congress did insulate contract markets from *parens patriae* suits and from the administrative remedy provided by reparations proceedings; but when it had the opportunity, Congress elected not to overrule the judicially created right of action against exchanges like the Board. We fail to see how an apparent congressional unwillingness to *extend* the liability of contract markets suggests an intention to *abolish* such liability altogether. Congress painstakingly immunized contract markets from some damage actions. Had it intended to eliminate private actions against exchanges entirely, it could have done so. Thus, legislative history simply does not support the position of the CBOT.

As the CBOT correctly points out, the House Committee on Agriculture voiced its concern

that attorneys to several boards of trade have been advising the boards to *reduce* —not expand exchange regulations designed to insure fair trading, since there is a growing body of opinion that failure to enforce exchange rules is a violation of the Act which will support suits by private litigants.

H.R. Rep. No. 975, 93d Cong., 2d Sess. 46 (1974). But the solution Congress opted for was not to eliminate private rights of action against exchanges. Rather, it was to provide a federal "regulatory umbrella," in the form of the CFTC, to insure that exchanges adequately performed their policing function. As Senator Talmadge, Chairman of the Senate Committee on Agriculture and Forestry, explained his Committee's bill to the Senate, "[t]he Commission is given the tools to require that the exchanges perform their regulatory functions better." 120 Cong.Rec. 30462 (1974). Thus, a private right of action against a contract market for failing to enforce rules which it knows, or reasonably should know, are being violated by floor traders, is perfectly compatible with the principal purpose of the Act, the strengthening of protections afforded the public.

B. *Private Damage Suits and the Public Interest Embodied in the CEA*

■ Defendant CBOT next argues that, since it and the CFTC share the responsibility for enforcing the CEA, it should enjoy the same immunity from private damage actions as the CFTC. The CBOT claims that the 1974 amendments to the CEA converted the Board into a "quasi-public" institution which is, "in respect to its self-regulatory activities . . . indistinguishable from the CFTC itself." (Memorandum of CBOT, at 55). To perform its "quasi-public" responsibilities, the Board contends, it must be immunized from private actions for damages.

In support of its argument, the Board cites a number of decisions containing *dicta* to the effect that private damage actions against individuals who are part of a self-regulatory scheme may chill self-regulatory efforts.[4] As a practical matter, however, this chilling effect is likely to occur only where the self-regulating entity, here the contract market, retains the power to lower the standards required of those regulated, here the floor traders, to a level which can

be more easily enforced. By vesting in the CFTC the power to review, approve and unilaterally amend exchange rules, *see* 7 U.S.C. Sections 7a(12), 12a(7), the 1974 amendments to the CEA effectively withdraw that power from the Board. Thus, the Board cannot, with impunity, escape its obligations under the amended CEA. If the Board attempts to suspend or even pursue less zealously its enforcement efforts, it might subject itself to a private damage action by injured investors, as well as substantial civil penalties and cease-and-desist orders enforceable by criminal sanctions. 7 U.S.C. Section 13a. If, on the other hand, the Board decides to relax its rules, and thereby institute a more comfortable enforcement regime, the CFTC can overturn this decision and amend the rules. 7 U.S.C. Section 12a(7). Viewed in this light, private damage actions against the Board are merely a supplementary means of compelling Board adherence to, and enforcement of the CEA.

We agree with *amicus curiae* that "the purposes of the Act are effectuated if a private right of action against an exchange is held to be available at least for the kind of conduct that is alleged in the complaint at bar." The complaint, it must be remembered, charges, *inter alia*, that the CBOT "knew, or should have known of (bucketing) by its members" and "failed and neglected to report and, in fact, concealed violations of the Commodity Act, the Rules and Regulations of the CFTC and its own By-Laws, Rules and Regulations by the defendant floor brokers and other members." (Complaint, pars. 35, 37). Our decision that a private right of action against the CBOT exists for the conduct complained of here, therefore, in no way vitiates the previously recognized immunity which the Board enjoys when it in good faith exercises the discretion accorded it by the CEA. *See, e. g., Lagorio v. Board of Trade of City of Chicago,* 529 F.2d 1290, 1292 (7th Cir. 1976).

---

4. *See, e. g., Utah State University v. Bear, Stearns & Co.,* 549 F.2d 164 (10th Cir. 1977); *Nelson v. Hench,* 428 F.Supp. 411 (D.Minn.

1977); *Landy v. Federal Deposit Insurance Corp.,* 486 F.2d 139 (3d Cir. 1973); *Lange v. H. Hentz & Co.,* 418 F.Supp. 1376 (N.D.Tex.1976).

The remainder of the Board's public policy argument—that it cannot both defend private actions and police floor traders, that it cannot conduct investigations when it fears that its findings may be used against it, that it cannot review its enforcement procedures without fear that its self-criticism will later haunt it in private damage actions—is equally untenable. Self-regulation of commodities markets and private actions against exchanges for not performing their self-regulatory function simply are not inconsistent enforcement devices. Thus, the Board's public policy argument must fail.

### C. *Statute of Limitations*

■ Defendant CBOT next contends that some of plaintiffs' claims are time-barred. To determine the appropriate limitations period for a cause of action which has been implied into a federal statute, we must consult analogous state law. *UAW v. Hoosier-Cardinal Corp.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1965). The Board argues that private actions for damages based upon an alleged failure to fulfill duties under a regulatory statute are "penal" in character, and are governed by the Illinois two year statute of limitations. Ill.Rev. Stat. ch. 83, Section 15.[5] Plaintiffs contend that the five year statute of limitations for civil actions "not otherwise provided for" should apply. *See* Ill.Rev.Stat. ch. 83, Section 16.[6] The Illinois Securities Law offers a third possibility, a three year limitations period. Ill.Rev.Stat. ch. 121½, Section 137.-13.[7] Each of these possible limitations periods must be examined more closely.

Illinois courts have applied the five year limitations provision favored by plaintiffs

to civil actions for negligence and fraud. *See, e. g., Thompson v. Howard*, 32 Ill. App.3d 991, 337 N.E.2d 94, 99 (3d Dist. 1975); *Coumoulas v. Service Gas, Inc.*, 10 Ill.App.3d 273, 293 N.E.2d 187 (2d Dist. 1973). In this case, the conduct with which defendants are charged does bear some resemblance to the common law torts of negligence and deceit or fraud. But this action is really a product of the statute, the CEA. The entire regulatory apparatus which defendants are alleged to have frustrated was created by the statute, and it was from the statute that courts originally implied the right of action which plaintiffs are now pursuing.

Where civil liability has resulted from the violation of a regulatory statute, Illinois courts have held that the liability is penal in nature. *Vestal Co. v. Robertson*, 277 Ill. 425, 115 N.E. 629 (1917); *Gridley v. Barnes*, 103 Ill. 211 (1882). Actions grounded upon those statutes, therefore, are subject to the two year limitations provision which governs suits for a "statutory penalty," even though plaintiffs might have availed themselves of a longer limitations period had they sued at common law. *Id.* In *Daly v. Columbia Broadcasting System, Inc.*, 309 F.2d 83 (7th Cir. 1962), the Seventh Circuit relied on the *Vestal* and *Gridley* cases in applying the two year statute of limitations to an action brought under the Federal Communications Act.

More recently, in *Parrent v. Midwest Rug Mills*, 455 F.2d 123 (7th Cir. 1972), the Seventh Circuit applied the three year limitations period in the Illinois Securities Law to private actions brought under Section 10(b) of the Securities Exchange Act and Rule

---

5. Section 15 of Chapter 83 provides:

Actions for damages for an injury to the person, or for false imprisonment, or for malicious prosecution, or for a statutory penalty, or for abduction, or for seduction, or for criminal conversation, shall be commenced within two years next after the cause of action accrued.

6. Ill.Rev.Stat. ch. 83, Section 16 provides:

[A]ctions on unwritten contracts, expressed or implied, or on awards of arbitration, or to recover damages for an injury done to property, real or personal, or to recover the possession of

personal property or damages for the detention or conversion thereof, and all civil actions not otherwise provided for, shall be commenced within 5 years next after the cause of action accrued.

7. Ill.Rev.Stat. ch. 121½, Section 137.13, provides in relevant part:

D. No action shall be brought for relief under this Section or upon or because of any of the matters for which relief is granted by this Section after three years from the date of sale.

10b–5. Focusing on the textual similarities of the federal and state securities laws, and especially their anti-fraud provisions, the court held that the three year limitations provision "best effectuated" the federal policy of protecting "the uninformed, the ignorant, the gullible." *Id.*, at 126. The court did not refer to the two year statute it had found applicable to another action implied from a federal regulatory statute in *Daly.*

Because the Illinois Securities Law now regulates trading in commodities futures, *see* Ill.Rev.Stat. ch. 121½, Section 137.2–1, we adopt the three year statute of limitations period here. We realize that our decision will give defrauded investors one year longer in which to bring their private actions than they have under the amended CEA to initiate reparations proceedings.[8] But the textual similarities of the two Acts, *compare, e. g.*, 7 U.S.C. Section 60 *with* Ill.Rev.Stat. ch. 121½, Section 137.12, and their similar purposes, leads us to believe that the three year limitation period "best effectuates" the policies underlying the CEA.

Having decided this preliminary matter, we turn again to the motion to dismiss. The complaint alleges misconduct by the individual defendants "from on or about January 1, 1969, up to and including the present date." (Complaint, pars. 24, 29). The complaint also charges that "notwithstanding warnings by CFTC personnel (in 1976 and 1977), the manipulative practices of the defendant floor brokers and other floor brokers was (sic) so widespread as to constitute a situation where the CBT either knew or should have known of said illegal conduct by its members." (Par. 35). Since wrongful acts are alleged to have been committed by defendants within the three years preceding the filing of this suit, at least some of the plaintiffs' claims are still live, and the motion to dismiss must be denied.

Furthermore, the complaint contains allegations which, if proved, would entitle plaintiffs to an equitable tolling of the statute of limitations. In paragraph 37, plaintiffs claim that defendants concealed from them violations of the Commodity Act, the Rules and Regulations of the CFTC, and the Board's own By-Laws. The tolling principle could save plaintiffs' claims against the CBOT as well as those against the individual defendants, for as the Seventh Circuit has said, "[t]he federal tolling doctrine operates both against those who commit the alleged fraudulent acts and those who negligently facilitate fraud." *Schaefer v. First National Bank of Lincolnwood,* 509 F.2d 1287, 1296 (7th Cir. 1975); *Tomera v. Galt,* 511 F.2d 504 (7th Cir. 1975).

In *Tomera, supra,* as in this case, the complaint alleged facts which, if proved, would trigger an equitable tolling. In reversing the district court's dismissal of the complaint, the court noted, "[l]imitations issues ordinarily require factual determinations and are best left to trial." 511 F.2d at 510, 511. Heeding this advice, we will not now decide which of plaintiffs' claims might be time-barred.

D. *The Board of Trade's Duty to Enforce Its Rules After April 21, 1975*

■ Defendant CBOT asserts that it was under no duty to enforce its rules after April 21, 1975, because the CFTC did not affirmatively approve those rules, as required by the CFTCA. 7 U.S.C. Section 7a(8). That section requires each contract market to:

(8) enforce all bylaws, rules, regulations, and resolutions, made or issued by it or by the governing board thereof or any committee, which relate to terms and conditions in contracts of sale to be executed on or subject to the rules of such contract market or relate to other trading requirements, *and which have been approved by the Commission pursuant to paragraph (12) of this section  .  .  ..*

This section, which took effect on April 21, 1975, replaced an earlier requirement that contract markets enforce all their rules which had not been disapproved by the Secretary of Agriculture. Under the CFTCA, the CFTC had a duty to review and affirm-

8. 7 U.S.C. Section 18(a).

atively approve each contract market rule by the effective date of the amendments. 7 U.S.C. Section 7a(12). Congress later granted the CFTC an additional 90 days, until July 18, 1975, in which to review and approve the exchanges' pre-existing rules. On July 17, the CFTC adopted Regulation Section 1.53 (17 C.F.R. Section 1.53), which provided

> Each contract market shall enforce each bylaw, rule, regulation, and resolution, made or issued by it or by the governing board thereof or any committee, which is in effect as of July 18, 1975, and which relates to terms and conditions in contracts of sale to be executed on or subject to the rules of such contract market or relate to other trading requirements, unless such bylaw, rule, regulation or resolution has been disapproved by the Commission pursuant to section 5a(12) of the Act, or the amendment or revocation of such bylaw, rule, regulation or resolution has been approved by the Commission pursuant to section 5a(12) of the Act.

The CBOT contends that Regulation Section 1.53 is invalid first, because in formulating and promulgating it, the CFTC did not follow the relevant rule-making provisions of the Administrative Procedure Act, see 5 U.S.C. Section 553; and second, because the CFTC lacked statutory authority to abolish by rule or regulation the requirement that it affirmatively approve contract market rules.

We need not reach the merits of these contentions now. Even if Regulation Section 1.53 is invalid, the CFTCA obligated the CBOT, as a contract market, to "provide for the prevention of manipulation of prices . . . ." 7 U.S.C. Section 7(d). If the Board negligently failed to carry out its duties under Section 7(d), it may be liable to plaintiffs completely apart from any potential liability under 7a(8).

■ Relying on the case of *Cargill, Inc. v. Hardin,* 452 F.2d 1154 (8th Cir. 1971), *cert. denied,* 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972), the CBOT contends that "This is *not* a 'manipulation' case." (Reply Memorandum of Board, at 2). Defendant's disingenuous interpretation of *Cargill,* however, cannot survive even the most superficial reading of that case. In *Cargill,* the court outlined the elements of a manipulation case where the Government alleged that defendant had employed a device known as a "little corner" or a "squeeze." The court in *Cargill* did not, as the Board claims, purport to enumerate the elements of every manipulation case, regardless of the precise theory of price manipulation relied on by a particular plaintiff. As the *Cargill* court itself noted

> We think the test of manipulation must largely be a practical one if the purposes of the Commodity Exchange Act are to be accomplished. The methods and techniques of manipulation are limited only by the ingenuity of man. *The aim must be therefore to discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand.*

452 F.2d at 1163. (emphasis added)

The practice of "bucketing" customers' orders can be just as manipulative of futures prices as the "squeeze." If, as plaintiffs claim, defendants executed certain futures transactions by pre-arrangement among themselves rather than by open outcry in the trading pit, their conduct "manipulated" the price at which plaintiffs traded and also affected the current quoted price for soybean futures in the pit. The CBOT's bald assertion that "this is not a manipulation case" cannot withstand recognition of this simply economic fact—by creating their own market for trading in soybean futures, defendants insulated plaintiffs' transactions from competitive forces and thereby manipulated the price at which soybean futures were traded.

The motion to dismiss Count III will be denied.

## V. PRIMARY JURISDICTION IN THE CFTC

■ Defendants argue that this case should be referred to the CFTC for adjudication of the alleged rule violations there.

We find no reason to apply the doctrine of primary jurisdiction. Since plaintiffs' antitrust claims have been dismissed, this is not a case where we need to draw on the particular expertise of the CFTC in accommodating the regulatory scheme of the CEA to the antitrust laws, as the CFTC is bound to do in issuing orders and approving regulations. 7 U.S.C. Section 19. *See Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973); *Chicago Mercantile Exchange v. Deaktor,* 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973). Nor is this a case where resolution of the issue requires the particular administrative expertise of the Commission. *See Lagorio v. Board of Trade of City of Chicago,* 529 F.2d 1290 (7th Cir.), *cert. denied,* 426 U.S. 950, 96 S.Ct. 3171, 49 L.Ed.2d 1187 (1976). The issues in this case—whether defendants bucketed orders in violation of the rules of the Board, and whether the Board failed to enforce its own rules—are within the fact-finding competence of this court. When confronted with similar questions of fact, other courts have also declined to defer to the CFTC. *See, e. g., Berenson v. Madda Trading Co.,* No. 78–544 (D.D.C.1978); *Shearson Hayden Stone, Inc. v. Lumber Merchants, Inc.,* 423 F.Supp. 559 (S.D.Fla. 1976).

As the Commission itself has pointed out, "private litigation seeking damages for alleged violation of provisions of the Act will rarely, if ever, involve issues appropriate for review by the Commission under the doctrine of primary jurisdiction." 41 Fed. Reg. at 18472. And, as the Commission noted in its amicus brief to this court, "[t]he judicial resolution of a private action involving concepts of manipulation, prearranged trading, and failure to enforce rules, 'requires only the application of specific statutory standards to the particular conduct alleged.'" (Amicus Curiae Brief, at 31). Thus, we decline to refer this action to the Commission.

## VI. CONCLUSION

Defendants' motions to dismiss Counts I and III of the complaint are denied. The motions to dismiss Count II are granted.

## SUPPLEMENTAL OPINION

Defendants move to modify Part IV C of our Memorandum Opinion dated February 2, 1979, on the grounds that the Illinois Securities Law does not regulate trading in commodities futures, and is therefore not the most analogous state law for purposes of the applicable statute of limitations. As defendants point out, our earlier reading of the definition of "security" in the amended Illinois act was too broad. "Security" as defined in the state statute includes

> any . . . option, put, call, privilege, indemnity or any other right to purchase or sell a contract for the future delivery of any commodity offered or sold to the public and not on a registered contract market . . ..

Ill.Rev.Stat. ch. 121½, Section 137.2–1. Thus, the Illinois law covers transactions in rights to purchase commodity futures, but not the underlying futures themselves. Furthermore, as defendants point out, and as noted in our opinion, at pp. 113–114, the Act would be preempted by the CFTCA to the extent that it attempted to regulate matters within the exclusive jurisdiction of the CFTC. The CFTC vests in the Commission exclusive jurisdiction with respect to

> accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option," "privilege," "indemnity," "bid," "offer," "put," "call," "advance guaranty," or "decline guaranty"), and transactions involving contracts of sale of a commodity for future delivery . . ..

7 U.S.C. Section 2.

We believe the Illinois Securities Law is still the most analogous state law, even though it does not cover transactions in commodities futures on contract markets. Commodities futures and commodities options are obviously distinct investment opportunities. But our search is only for the most analogous state law. The acts alleged to have been committed by defendants depend for their significance not on the thing

traded, but on their fraudulent nature. That these defendants are alleged to have defrauded investors and manipulated prices through their illegal conduct on the floor of an exchange makes this action more closely resemble one brought under the Illinois Securities Law than an action for a statutory penalty. Defendants allegedly violated not just a regulatory statute, but a regulatory statute designed to protect investors. Thus, the federal purpose is best served by adopting the limitations period of the Illinois Securities Law.