**Joseph STROBL, Plaintiff-Appellee Cross-Appellant,**

v.

**NEW YORK MERCANTILE EXCHANGE, Clayton Brokerage Co. of St. Louis, Inc., Heinold Commodities, Inc., Thomson and McKinnon, Auchincloss, Kohlmeyer, Inc., Ben Pressner, Pressner Trading Corp., John Richard Simplot a/k/a Jack Richard Simplot, a/k/a J.R. Simplot, J.R. Simplot Company, Simplot Industries, Inc., Simplot Products Company, Inc., Peter J. Tagares a/k/a Peter J. Taggares, P.J. Taggares Company, C.L. Otter, SimTag Farms, Kenneth Ramm, A & B Farms, Inc., Hugh D. Glenn, Gearheart Farming, Inc., Ed McKay, Harvey Pollak, Henry Pollak, Henry Pollak, Inc., Henry A. Pollak & Company, Inc., Robert Reardon a/k/a Bobby Reardon, F.J. Reardon, Inc., Alex Sinclair, Sinclair & Company, Stephen Sundheimer, Charles Edelstein, James Landry a/k/a Jim Landry and Jerry Rafferty, jointly and severally, Defendants,**

**John R. Simplot, J.R. Simplot Co., Simplot Industries, Inc., P.J. Taggares, P.J. Taggares Company and SimTag Farms, Defendants-Appellants Cross Appellees.**

**Nos. 648, 781, Dockets 84–7328, 84–7770.**

United States Court of Appeals, Second Circuit.

Argued Feb. 13, 1985.

Decided July 5, 1985.

Before FEINBERG, Chief Judge, and TIMBERS and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal represents the latest chapter in a long history of litigation generated by the highly publicized May 1976 default of Maine potato futures contracts that occurred when the sellers of 1000 contracts failed to deliver approximately 50 million pounds of potatoes. The sellers' refusal to deliver brought about the largest default in the history of commodities futures trading. Throughout an 11-day trial before the United States District Court for the Southern District of New York (MacMahon, J.), plaintiff Joseph Strobl contended that defendants J.R. Simplot, P.J. Taggares and their potato processing companies acting in concert as sellers brought about this default. Strobl claimed that these defendants engaged in a conspiracy to drive down potato prices and default on Maine potato futures contracts and that they profited by reducing the prices they paid for potatoes in 1976 and thereafter. Strobl had invested in 1976 Maine potato futures; the damages he claimed were the difference between what he received from the sale of those futures and what he would have received in a fair market.

In his complaint Strobl asserted both a private right of action for damages under § 9 of the Commodity Exchange Act as amended, 7 U.S.C. § 13, and antitrust claims under §§ 1–3 of the Sherman Act, 15 U.S.C. §§ 1–3, and § 2 of the Clayton Act, 15 U.S.C. § 13. The jury found for Strobl both on his private right of action under the Commodity Exchange Act and on his antitrust claims under the Sherman and Clayton Acts. The district court awarded him treble damages amounting to $1,386,000 on the antitrust claims and, in the alternative, single damages of $460,000 on the Commodity Exchange Act claim.

On appeal, defendants attack the sufficiency of the evidence to show a conspiracy prior to the time when Strobl liquidated his commodities futures position, and also the

Peter Fleming, Jr., New York City (Scott J. McKay Wolas, Peter K. Vigeland, Michael T. Zimmerman, Curtis, Mallet-Prevost, Colt & Mosle, New York City, of counsel), for defendants-appellants cross-appellees.

Christopher Lovell, New York City (Victor E. Stewart, George F. Brammer, Jr., Lovell & Stewart, New York City, of counsel), for plaintiff-appellee cross-appellant.

sufficiency of evidence to show, prior to that time, the existence of an artificial futures price. Defendants further claim that the damage award was irrational and should be reduced. They also contend that the district court committed reversible error when it refused to admit into evidence a decision in an administrative proceeding that arose from these same facts, and when it failed to order a new trial after the same administrative law judge rendered a second decision. Strobl cross-appeals from the district court's order that denied him prejudgment interest on the Sherman Act damages.

We reject defendants' arguments substantially for the reasons stated in Judge MacMahon's thorough opinions on defendants' motion for a judgment N.O.V. and for a new trial. Both of these opinions, published in separate volumes of the Federal Supplement, are entitled *Strobl v. New York Mercantile Exchange*, 582 F.Supp. 770 (S.D.N.Y.1984) and 590 F.Supp. 875 (S.D.N.Y.1984). Moreover, we agree with the reasons given by the district court when it denied plaintiff prejudgment interest on the Sherman Act damages, 590 F.Supp. at 882–83.

Thus, the only issue necessary to address is defendants' argument that antitrust causes of action are not properly raised by plaintiff because conduct specifically prohibited by the Commodity Exchange Act cannot be the basis for a treble damage award under the antitrust laws. To date no other circuit court has decided this specific issue. Because we find defendants' contention unpersuasive, we affirm the judgment appealed from.

## I Facts

The complex factual background and procedural history of this case is described thoroughly in the following decisions: *National Super Spuds, Inc. v. New York Mercantile Exchange*, 470 F.Supp. 1256 (S.D.N.Y.1979), *rev'd sub nom. Leist v. Simplot*, 638 F.2d 283 (2d Cir.1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). These cases also provide a detailed background of the structure and regulation of the commodities futures trading market. We summarize here only the factual background needed to understand this appeal.

This case involves commodities futures contracts for Maine potatoes. A commodities futures contract is an executory contract for the sale of a commodity executed at a specific point in time with delivery of the commodity postponed to a future date. Every commodities futures contract has a seller and a buyer. The seller, called a "short," agrees for a price, fixed at the time of contract, to deliver a specified quantity and grade of an identified commodity at a date set in the future. The buyer, or "long," agrees to accept delivery at that future date at the price fixed in the contract. It is the rare case when buyers and sellers settle their obligations under futures contracts by actually delivering the commodity. Rather, they routinely take a short or long position in order to speculate on the future price of the commodity. Then, sometime before delivery is due, they offset or liquidate their positions by entering the market again and purchasing an equal number of opposite contracts, *i.e.*, a short buys long, a long buys short. In this way their obligations under the original liquidating contracts offset each other. The difference in price between the original contract and the offsetting contract determines the amount of money made or lost.

In September and October of 1975 plaintiff invested in the long or buying side of May 1976 Maine potato futures contracts, that is he agreed to buy potatoes at an agreed price on a future date. Strobl's average cost was approximately $18.30 per hundredweight (cwt). By May 4, 1976 Strobl had liquidated all of his long contracts at an average price of between $9.12 and $9.76 per cwt. According to proof at trial, the defendants Simplot and Taggares, two of the largest competitors in the purchase and processing of potatoes, conspired to manipulate the futures prices in Maine potatoes. Maine potato futures prices

were unusually high in 1976. This was because of record demand for and low supply of Maine potatoes. This high futures price tended to drive up cash potato prices. Yet, due to their need to purchase large quantities of potatoes, the defendants had an interest in lower potato prices. By its verdict the jury found that these defendants conspired to reduce the price of the 1976 Maine potatoes futures contracts. Defendants accomplished this by purchasing vast amounts of the "short" side of futures contracts and becoming obligated to deliver millions of pounds of Maine potatoes that they did not have. By purchasing so heavily on the short side, the conspirators artificially inflated the perceived supply of Maine potatoes, thereby driving down both the futures prices and cash prices. Defendants did not attempt to obtain the potatoes that they were obligated to deliver. Nor did they offset, which they could have done by purchasing long positions in an amount sufficient to equalize their extensive short position. Instead, defendants simply defaulted on their delivery obligations. With so many selling positions not offset by buying positions, there was a surplus of sellers, which effectively caused the price of Maine potato commodities contracts to plummet. By May 4, 1976 Strobl had sold his long futures on Maine potatoes at a significant loss. The jury found that this conspiracy existed before May 4 and that it depressed the futures price on May 1976 Maine potatoes prior to that date.

## II  COMMODITY EXCHANGE ACT

### A. *Background*

To answer defendants' claim that the treble damage award cannot stand, we begin with an explanation of the Commodity Exchange Act. The history of commodities regulation and the Act has been exhaustively discussed by this Court in an earlier opinion on another aspect of this case, *Leist v. Simplot*, 638 F.2d at 293–96, and in the Supreme Court's affirmance, *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. at 357–67, 102 S.Ct. at 1828–34. Thus, it is outlined only briefly here.

The first federal regulation of commodities futures trading came in 1921 with enactment of the Futures Trading Act, 42 Stat. 187 (1921). When that Act was declared an unconstitutional exercise of the taxing power, *Hill v. Wallace*, 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822 (1922), it was redrafted and enacted as the Grain Futures Act, 42 Stat. 998 (1922). These early Acts established the pattern of commodity futures regulation: federal supervision of trading that takes place on central exchanges; enforcement provided by the Secretary of Agriculture; fines and imprisonment established for violations, which included price manipulation. The provision that prohibits manipulation of prices has remained virtually unchanged, and it is that provision that the defendants have been found to have violated.

The Commodity Exchange Act, 49 Stat. 1491 (1936), extended the coverage of the earlier Acts, but did not alter the method of regulation. The 1968 amendments, 82 Stat. 26 (1968), further extended the Act's coverage and strengthened its penalties. The Act was amended again in 1974 by the Commodity Futures Trading Commission Act of 1974, 88 Stat. 1389 (1974).

In contrast to the limited scope of the 1968 amendments, the 1974 amendments, 88 Stat. 1389 (1974), constituted a complete overhaul of the Act. They broadened its coverage from the agricultural commodities with which it had historically been concerned to include "all other goods and articles ... and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in", subject to certain exceptions designed primarily to exclude securities. Consistently with this expansion in coverage, enforcement was transferred from the Department of Agriculture to a newly constituted Commodity Futures Trading Commission·(CFTC). *Leist v. Simplot*, 638 F.2d at 295. Although the 1974 amendments gave the Commodity Futures Trading Commission (Commission or CFTC) greater enforcement powers than its predecessor, the pro-

visions describing prohibited activity, specifically price manipulation, remained essentially unchanged.[1]

In *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, the Supreme Court affirmed our holding in *Leist v. Simplot* that plaintiffs have a private right of action under the Commodity Exchange Act, as amended in 1974. The *Merrill Lynch* Court characterized the Act as " 'a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex.' " 456 U.S. at 356, 102 S.Ct. at 1828 (quoting H.R.Rep. No. 975, 93d Cong., 2d Sess. 1 (1974)). Plaintiffs had a private right of action for damages under that statute, the Supreme Court reasoned, because such actions had been permitted in the past, and because when Congress amended the statute it left intact those provisions under which lower federal courts had found an implied right of action. This constituted evidence that Congress wanted to preserve that remedy. 456 U.S. at 374–82, 102 S.Ct. at 1837–41. In addition, the legislative history of the amendments revealed Congress's aim to preserve the remedy. *Id.* at 382–88, 102 S.Ct. at 1841–44.

### B. *Implied Repeal of the Antitrust Laws*

Defendants argue that antitrust laws no longer apply to activity that violates the Commodity Exchange Act. To support that proposition they point first to Supreme Court cases that have discussed or found implied repeal of the antitrust laws by the securities laws. To the contrary, we conclude that those cases indicate that Congress aimed to have activities such as those engaged in by the defendants in this case covered by the antitrust laws.

In *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), the Supreme Court considered the relationship of the antitrust laws and the Securities Exchange Act of 1934. The stock exchange had ordered some of its members to remove private direct telephone connections those members had with the offices of nonmembers located in the State of Texas. Specifically at issue was whether such action, which would be a per se violation of § 1 of the Sherman Act, was immune from a lawsuit based on the antitrust laws because of the self-regulation features of the securities laws. The Court announced a "guiding principle" for reconciliation of the antitrust laws with a regulatory scheme adopted in a statute. According to the Court, "[r]epeal is to be regarded as implied only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary." 373 U.S. at 357, 83 S.Ct. at 1257. Because the Securities Exchange Commission, the regulatory agency involved, had no power to supervise the application of the SEC Rules under attack, *Silver* held that permitting suit under the antitrust laws did not disturb the regulatory scheme. The Court added that "[s]hould review of exchange self-regulation be provided through a vehicle other than the antitrust laws, a different case as to antitrust exemption would be presented." *Id.* at 360, 83 S.Ct. at 1258. Moreover, in a footnote it stated:

> Were there Commission jurisdiction and ensuing judicial review for scrutiny of a particular exchange ruling ... a different case would arise concerning exemption from the operation of laws designed to prevent anticompetitive activity, an issue we do not decide today.

*Id.* at 358 n. 12, 83 S.Ct. at 1257 n. 12.

The issue that the Supreme Court left open in *Silver* was resolved in *Gordon v. New York Stock Exchange*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975). In that case plaintiffs sued the New York Stock Exchange claiming that the system of fixed commission rates used by the Exchange violated §§ 1 and 2 of the Sherman Act. Section 19(b)(9) of the Securities Ex-

---

1. The Commodity Exchange Act was further amended by the Futures Trading Act of 1978, 92 Stat. 865 (1978), and the Futures Trading Act of 1982, 96 Stat. 2294 (1983). These amendments are not relevant to this appeal because the activities at issue all occurred prior to their enactment.

change Act gave the SEC authority to approve or disapprove exchange commission rates. Inasmuch as the SEC had such authority—and because it used that authority—the Supreme Court held that the system of fixed commission rates was beyond the reach of the antitrust laws. *See* 422 U.S. at 691–92, 95 S.Ct. at 2615–16 (Douglas, J., concurring).

The Court reasoned, first, that the SEC's exercise of its authority over the rates, and Congress's continued approval of that authority, demonstrated Congress's desire that the fixing of rates be left to the SEC. Further, it determined that implied repeal of the antitrust laws was necessary for the Securities Exchange Act to function effectively. The reason is plain. In setting commission rates, the SEC is concerned not only with protecting competition—as are the antitrust laws—but also with "the economic health of the investors, the exchanges, and the securities industry." *Id.* at 689, 95 S.Ct. at 2614 (footnote omitted). Without antitrust immunity the exchanges would be subject to varying standards or requirements issued by diverse federal courts and thereby be unable to function in a consistent manner, without violating either the mandate of an antitrust judicial decision or the Rules of the SEC. *Id.*

Defendants claim that *Silver* and *Gordon* can be read to say that when a commodities exchange activity is subject to the jurisdiction of some regulatory body, it is exempt from the antitrust laws. This oversimplified reading does not survive closer analysis. Both *Silver* and *Gordon* discussed potential *conflicts* between the antitrust laws and a regulatory scheme. *See United States v. Philadelphia National Bank*, 374 U.S. 321, 352, 83 S.Ct. 1715, 1735, 10 L.Ed.2d 915 (1963) (consolidation of banks under the Bank Merger Act was enjoined under the Clayton Act as there was no conflict between the two Acts). Their holdings teach that antitrust laws may not apply when such laws would prohibit an action that a regulatory scheme

might allow. Both cases reassert that "[r]epeal of the antitrust laws by implication is not favored and not casually to be allowed," and is to be implied "[o]nly where there is a 'plain repugnancy between the antitrust and regulatory provisions.'" *Gordon*, 422 U.S. at 682, 95 S.Ct. at 2611 (quoting *Philadelphia National Bank*, 374 U.S. at 350–51, 83 S.Ct. at 1734–35). The "plain repugnancy" found in *Gordon* was the potential for *conflicting* standards and the fact that application of antitrust laws would render § 19(b)(9) of the Securities Exchange Act nugatory. *Gordon*, 422 U.S. at 689, 95 S.Ct. at 2614. Thus, repeal of antitrust jurisdiction cannot be implied simply when the antitrust laws and a regulatory scheme overlap.

In the instant case, the Commodity Exchange Act clearly governs the activities at issue.[2] Price manipulation—the activity in which defendants were found to have engaged—is specifically forbidden. Section 6(b) of the Act, 7 U.S.C. § 9, prohibits market manipulations and corners. Section 5(d), 7 U.S.C. § 7(d), makes it a condition of contract market designation for an exchange to provide for the prevention of those abuses. Section 8a(9), 7 U.S.C. § 12a(9), authorizes the Commission to declare an emergency and order appropriate steps if there are "threatened or actual manipulations or corners." Section 9(b), 7 U.S.C. § 13(b), makes it a felony to commit the offenses of price manipulation or cornering. The Commission is also empowered to take steps to reduce the risk that these offenses will be committed. *See* 7 U.S.C. § 13a–1 (CFTC may seek an injunction against person who is "restraining trading"); § 12a(7) (CFTC may "alter or supplement the rules of a contract market" to protect "persons producing, handling, processing, or consuming any commodity traded for future delivery ..., or the product or byproduct thereof, or for the protection of traders or to insure fair dealing in commodities traded for future delivery"); and § 7a(10) (CFTC may direct that revi-

---

**2.** Unless stated otherwise, all citations to the Commodity Exchange Act refer to provisions

enacted prior to the 1978 and 1983 amendments. *See* note 1, *supra.*

sions be made in futures contracts with respect to delivery locations and price differentials "as will tend to prevent or diminish price manipulation, market congestion, or the abnormal movement of such commodity in interstate commerce"). In fact, the Commodity Exchange Act is "bristling with anti-manipulation provisions." *See* I M. Johnson, *Commodities Regulation* § 1.86, at 193 (1982). As price manipulation also violates antitrust laws, none of these provisions conflicts with the purposes and standards of the antitrust laws. There is no built-in balance in the regulatory scheme of the Act that permits a little price manipulation in order to further some other statutory goal. Quite the opposite, price manipulation is an evil that is always forbidden under every circumstance by both the Commodity Exchange Act and the antitrust laws. Therefore, application of the latter cannot be said to be repugnant to the purposes of the former.

### C. *Legislative History*

Defendants next claim that the legislative history of the 1974 amendments demonstrates a congressional purpose to eliminate antitrust causes of action for Commodity Exchange Act violations. The defendants' argument focuses primarily on Congress's rejection, prior to passing the 1974 amendments, of three bills that would have provided for treble damages for Commodity Exchange Act violations. Defendants contend that this "unequivocally demonstrates" that Congress did not intend to provide an antitrust treble damage remedy for conduct violative of the Act. This leap of logic falls short of being persuasive. The fact that Congress considered and rejected a treble damage remedy for Act violations says nothing about its view with respect to antitrust violations. Congress might well have decided that treble damages under the antitrust laws were sufficient and that there was no need, therefore, to add such a remedy to the Commodity Exchange Act. The most that can safely be implied from the rejection of these bills is that it was not Congress's purpose either to expand or contract treble damage remedies.

Contrary to defendants' view, the legislative history of the 1974 amendments reveals that Congress desired the continued application of the antitrust laws to those anti-competitive practices that also violate the Commodity Exchange Act. There is no doubt that such laws have traditionally been applied to the commodities industry. *See, e.g., Chicago Board of Trade v. Olsen,* 262 U.S. 1, 39–40, 43 S.Ct. 470, 478–479, 67 L.Ed. 839 (1923); *Chicago Board of Trade v. United States,* 246 U.S. 231, 238–41, 38 S.Ct. 242, 243–245, 62 L.Ed. 683 (1918); *United States v. Patten,* 226 U.S. 525, 541–43, 33 S.Ct. 141, 144–145, 57 L.Ed. 333 (1913); *Miller v. New York Produce Exchange,* 550 F.2d 762, 766–68 (2d Cir.), *cert. denied,* 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977). During the process of enactment of the 1974 amendments, the House Agriculture Committee unanimously struck from the original draft an exemption from coverage under the antitrust laws for commodities futures transactions. *See Hearings on S. 2485, S. 2578, S. 2837 and H.R. 13113 before the Senate Comm. on Agriculture and Forestry,* 93d Cong., 2d Sess. 259 (1974) (Senate Hearings).

Further, there was ample testimony during the debate over the proposed amendments that supports plaintiff's position that Congress wanted to continue antitrust jurisdiction. Chairman Rodino of the House Judiciary Committee testified at length on this subject stating:

> The nature of commodity futures markets demonstrates the peculiar intimacy and special relationship these markets have with the fundamental national legal, economic, and social policies expressed in our antitrust laws since enactment of the Sherman Act in 1890. . . .
>
> . . . .
>
> . . . By insuring the applicability of the antitrust laws to the commodity futures industry, the purpose of these laws, "the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest ma-

terial progress," *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 4 [78 S.Ct. 514, 517, 2 L.Ed.2d 545](1958), will be promoted as well as protected. Senate Hearings, *supra*, at 257–58. It was feared that a proviso in the draft bill that conferred "exclusive jurisdiction" on the Commission would be read as an attempt to preempt even federal courts from jurisdiction over commodities trading. Congressman Rodino commented:

> That such a result was not intended in the House is readily apparent from the House action striking the original antitrust exempting provision; antitrust laws are to apply to commodity transactions and, of course, federal courts play an instrumental role in promoting as well as protecting the national policies expressed already in the antitrust laws.

*Id.* at 259. The House leadership urged the Senate to amend the bill to read: "And provided further, That nothing herein contained shall supersede or limit the jurisdiction at any time conferred on the Securities Exchange Commission or other regulatory authorities and on federal court." *Id.* at 260. The bill as finally passed by both Houses contained substantially the language suggested. *See* § 2(a)(1) of the Commodity Exchange Act, 7 U.S.C. § 2.

■ Plainly, Congress had the issue of the applicability of the antitrust laws to commodities trading squarely before it. It was aware that the antitrust laws had historically been applied in that context and expressly rejected attempts to change that scheme. Significantly, Congress adopted language that had been proposed to insure that the antitrust laws would remain applicable to commodities trading and preserved the jurisdiction of the federal courts in the commodities field. All of this points inescapably to the conclusion that it was part of Congress's fixed purpose to have the antitrust laws apply in a case such as the instant one. We therefore hold that enactment of the Commodity Exchange Act did not effect a repeal of the antitrust laws.

## III   STATUTORY CONSTRUCTION

### A.   *The Specific Remedy Rule*

■ Even if there is no Congressional repeal of the anti-trust laws with respect to activity that also violates the Commodity Exchange Act, defendants assert that an antitrust cause of action cannot be maintained in this case because it is a "cornerstone of statutory construction" that specific terms prevail over general ones in the same or another statute that might otherwise be controlling. The argument assumes that inasmuch as the Commodity Exchange Act specifically rules out price manipulation in the commodities market, a private right of action under that statute must be pursued instead of an action under the more general interdiction of the antitrust laws. For this "specific remedy rule," defendants rely on two Illinois district court cases. *Smith v. Groover*, 468 F.Supp. 105 (N.D.Ill.1979), and *Schaefer v. First National Bank of Lincolnwood*, 326 F.Supp. 1186 (N.D.Ill.1970), *aff'd in part and rev'd in part*, 509 F.2d 1287 (7th Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976).

The district court in *Smith v. Groover* faced a situation in all important respects identical to the one here. Plaintiffs alleged that defendants "bucketed" orders for soybean futures in violation of the Chicago Board of Trade and CFTC regulations. Bucketing is "[d]irectly or indirectly taking the opposite side of a customer's order into the handling brokers [sic] own account or into an account in which he has an interest, without bona fide speculation on an Exchange." S.Rep. No. 1131, 93d Cong., 2d Sess. app. IX, *reprinted in* 1974 U.S.Code Cong. & Ad.News 5843, 5891. Plaintiffs also claimed that the bucketing activity violated the Sherman Act. The *Smith* court found that because "plaintiffs ha[d] a private right of action under the [Commodity Exchange Act], their antitrust claims ... [were] 'superfluous.' The specific statutory prohibitions contained in the [Commodity Exchange Act], as amended, must prevail over the general prohibitions of the Sherman Act." 468 F.Supp. at 116. The

court further observed that only single damages are recoverable under the Commodity Exchange Act, while the Sherman Act permits treble damages, and concluded therefore that plaintiffs must pursue the more specific remedy. *Id.* The issue was not, according to the *Smith* court, one of implied repeal of the antitrust laws. It was merely "whether plaintiffs may pursue different remedies, one which is aimed at the precise conduct alleged to have been committed by defendants, and the other which is aimed at a universe of conduct, of which defendants' alleged acts constitute just a small set." *Id.* at 116–17.

In reaching its conclusions the court adopted the analysis in *Schaefer v. First National Bank of Lincolnwood.* In *Schaefer* stock purchasers sought to recover damages for defendants' alleged conspiracy to manipulate the market for their stock. The court found, first, that the specific remedies in the securities acts controlled over the more general prohibitions of the antitrust laws. 326 F.Supp. at 1190–91. The court explained that clauses in the 1933 and 1934 Securities Acts that preserved "rights and remedies that may exist at law or in equity" did not change its analysis. Stock market manipulation schemes had not been considered "restraint of trade" at common law, and had thus not come under the coverage of the Sherman Act. *Id.* at 1191–92. Finally, the court noted that there would be a number of inconsistencies were plaintiffs to be permitted to pursue both their Sherman Act and Securities Acts causes of action. These included differences in damage remedies, statutes of limitations, and provisions for attorney's fees. It concluded that to allow pursuit of both remedies would encourage investors to bring suit under the Sherman Act, a result that it said "Congress could not have intended." *Id.* at 1192.

### B. *Application of the Specific Remedy Rule to This Case*

We expressly refuse to adopt the rationale of *Smith* or *Schaefer.* We first note that, unlike the securities and antitrust laws, the *commodities* and antitrust laws

have long co-existed. This distinction aside, we do not believe that the specific remedy rule—a rule of statutory construction—should be applied in this case. *See Strax v. Commodity Exchange, Inc.*, 524 F.Supp. 936, 940 (S.D.N.Y.1981); *Pollock v. Citrus Associates*, 512 F.Supp. 711, 715–17 (S.D.N.Y.1981).

The *Smith* court's distinction between its analysis and an implied repeal of the antitrust laws is untenable. If the *Smith* court intended by its holding that a plaintiff can never pursue an antitrust remedy for anticompetitive activity that also violates the Commodity Exchange Act, then it ruled, in effect, that antitrust laws do not apply to that kind of activity. Further, if to reach that result the court relied on the specific remedy rule it was then stating that in this context Congress aimed to repeal the antitrust laws. For reasons previously discussed, we reject this view. Alternatively, if defendants rely on *Smith* to argue that plaintiff may not *plead* both a specific Commodity Exchange Act cause of action and a general cause of action under the antitrust laws they are plainly mistaken. To accept that proposition would be repugnant to the Federal Rules of Practice, which provide that inconsistent causes of action may be stated alternatively or hypothetically. Fed.R.Civ.P. 8(a)(3) and 8(e)(2). *Pollock v. Citrus Associates*, 512 F.Supp. at 716.

■ In sum, although the "specific over general" principle is an accepted rule of statutory interpretation, *see, e.g., Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153, 96 S.Ct. 1989, 1992, 48 L.Ed.2d 540 (1976), it is not to be followed blindly. Statutes are to be construed together to effectuate, to the greatest extent possible, the legislative policies of both. *United States v. Borden Co.*, 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939). A proper statement of the specific remedy rule is that absent clear evidence of contrary intent, a specific statute is not controlled by a general one. *See Morton v. Mancari*, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974).

Here, as noted earlier, the history of the Commodity Exchange Act, and of the enactment of the 1974 amendments to that act, provide compelling evidence of contrary intent.

## IV  CONCLUSION

Accordingly, we hold that the district court correctly allowed plaintiff to pursue an antitrust cause of action in this case. The judgment awarding plaintiff treble damages is affirmed.